NOT DESIGNATED FOR PUBLICATION

No. 115,229

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PETTIX MCMILLAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC R. YOST, judge. Opinion filed August 11, 2017. Affirmed.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON, J., and FAIRCHILD, S.J.

*Per Curiam*: As his marriage crumbled, Defendant Pettix McMillan shot his wife with a pistol during an argument and then turned the gun on two of their children. A jury sitting in Sedgwick County District Court convicted him of three counts of attempted first-degree murder. McMillan has appealed the convictions on the grounds the district court erroneously denied his pretrial motion alleging a violation of his statutory right to a speedy trial. He also contends the district court incorrectly classified an earlier conviction of his as a person felony in determining his criminal history, thereby impermissibly

1

increasing his sentence. We find neither argument warrants relief and, therefore, affirm McMillan's convictions and sentence.

*Speedy Trial Issues*

McMillan argues he was not brought to trial within the time limit fixed in K.S.A. 2016 Supp. 22-3402(a), which establishes a statutory right to speedy trial. McMillan also asserts related violations of his statutory and constitutional rights to personally appear at all critical stages of the case because he was not present when the district court considered and granted continuances of the trial setting. See K.S.A. 22-3405(1); *State v. Wright*, 305 Kan. 1176, 1178, 390 P.3d 899 (2017) (district court hearing on motion for trial continuance deemed critical stage at least when requested delay would exceed time limit in K.S.A. 2012 Supp. 22-3402[a]). But he does not claim a violation of his constitutional right to speedy trial protected in the Sixth Amendment to the United States Constitution.

We take those points in order. The first requires a close look at the procedural history of the case, most notably, of course, the circumstances bearing on the continuances of the trial. The second implicates the facts of the criminal episode, so we defer that discussion.

The shootings happened on March 24, 2014. McMillan was arrested almost immediately and was charged within several days. Nearly a year later, he filed a pro se motion to dismiss the case alleging his statutory speedy trial rights had been violated and he had not been present when the district court granted multiple continuances. The district court held an evidentiary hearing on the motion the day the jury trial began. McMillan's trial lawyer represented him during the hearing. The three lawyers who had previously represented McMillan testified, as did McMillan. The district court ruled that the lawyers had consulted with McMillan so the continuances did not count against the

2

speedy trial time limitation, as provided in K.S.A. 2016 Supp. 22-3402(g). As we explain, the district court's ultimate conclusion was correct, but the rationale seems to be off the mark.

Under K.S.A. 2016 Supp. 22-3402(a), a defendant being detained must be "brought to trial within 150 days," except for delays resulting from his or her "application or fault" or from four specifically described circumstances not at issue here. The legislature extended the time period from 90 to 150 days effective July 1, 2014. L. 2014, ch. 139, § 5. McMillan assumes the shorter period applies because it was in effect when the alleged crimes occurred. The State suggests McMillan has no valid claim under either version of the statute. The Kansas Supreme Court has indicated that the number of days composing the speedy trial time reflects and is part of a procedural mechanism, so amendments to K.S.A. 22-3402 generally should be applied in pending cases. *State v. Dupree*, 304 Kan. 43, 54-57, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016). The 150-day time period applies here, although it really has no direct impact on the outcome.

On appeal, the parties agree 47 days indisputably should be attributed to the State. We have no reason to say otherwise. We also point out that the way the statute is written any time not attributed to the defendant necessarily counts toward the time period for bringing that defendant to trial and is, thus, functionally charged to the State. In other words, time delays must either be assigned to the defendant or be included in the 150-day period. There is no category for unattributable time.

McMillan identifies five continuances that affected his statutory speedy trial rights. We identify them and incorporate descriptive information from the record about each.

• July 14, 2014, to September 22, 2014 (70 days). Charles Osburn, then a lawyer with the public defender's office, represented McMillan. He requested the delay to

3

continue preparing the case, including getting a transcript of the preliminary hearing and exploring potential defenses based on diminished capacity. Osburn testified that he did not specifically recall talking with McMillan about the continuance but said his standard practice would have been to inform a client of the anticipated timeline for the case. Osburn testified he would not have sought McMillan's permission regarding a requested continuance. McMillan testified Osburn did not "consult" with him about the continuance and he did not consent to the delay. But McMillan did not testify that he directly told Osburn he opposed any trial continuances.

• September 22 to October 20 (28 days). Osburn testified that the public defender's office developed a conflict, precluding him or anyone else on the staff from representing McMillan. The continuance was to allow appointment of a new lawyer for McMillan. McMillan testified he was not consulted about the continuance and did not consent to it. Casey Cotton was appointed to represent McMillan and officially did so for about 2 weeks. He testified that a conflicts check revealed a problem with his representation of McMillan, so he withdrew. Cotton did not request any continuances. Patrick Mitchell was then appointed to represent McMillan.

• October 20 to November 3 (14 days). Mitchell testified he received the notice of his appointment to represent McMillan several days before the October 20 trial setting and immediately requested the brief continuance. He said he did so without talking to McMillan.

• November 3 to December 15 (42 days). Mitchell testified that he met several times with McMillan and corresponded with him. Mitchell testified that in those communications he explained he would be requesting at least one continuance to accommodate a mandatory trial setting in another case and to fully prepare to try McMillan's case. Again, McMillan testified that he was not consulted about and did not consent to the continuance.

4

• December 15, 2014, to March, 25, 2015 (100 days). Mitchell testified he could not recall if he discussed this continuance with McMillan apart from the earlier communications about his need to move the trial back for an unspecified period because of the other case and to sufficiently prepare McMillan's case. McMillan testified that he explicitly told Mitchell he did not want his case continued again from what would have been the December setting and insisted on "a speedy trial." As we have indicated, McMillan did not testify to having made similar objections to the other continuances.

Pivotal to the statutory speedy trial claim are the substantial limitations in K.S.A. 2016 Supp. 22-3402(g) on reallocating time originally attributed to a defendant. The subsection states:

> "If a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant regardless of the reasons for making the request, unless there is prosecutorial misconduct related to such delay. If a delay is initially attributed to the defendant, but is subsequently charged to the state for any reason, such delay shall not be considered against the state under subsections (a), (b) or (c) and shall not be used as a ground for dismissing a case or for reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." K.S.A. 2016 Supp. 22-3402(g).

The Kansas Supreme Court has recognized that subsection (g) contains two independent, though overlapping, provisions limiting what time may be counted against the speedy trial period. *State v. Brownlee*, 302 Kan. 491, 510-11, 354 P.3d 525 (2015). The first sentence entails a limitation applicable when defendants personally or defense lawyers, after consulting with their clients, request and are granted continuances. The district court relied on this part of the statute. The limitation kicks in when defendants approve the requests—either because they themselves have made the requests or because they have

authorized their lawyers to do the asking. 302 Kan. at 510. In those situations, the time associated with an approved continuance cannot later be counted against the speedy trial period, unless some sort of prosecutorial misconduct materially "related to [the] delay." K.S.A. 2016 Supp. 22-3402(g).

In *Brownlee*, the court declined to apply that limitation because Brownlee did not "acquiesce" in the continuance his lawyer requested and received. 302 Kan. at 510. Here, the evidence indicates McMillan didn't agree to or acquiesce in any of the continuances, although he was given at least some form of advance notice about most of them. McMillan, then, seems to be in a posture comparable to Brownlee. We, therefore, doubt that the "consultation" limitation applies, and the district court likely erred in relying on it.

The second sentence in K.S.A. 2016 Supp. 22-3402(g) creates another and markedly broader limitation. That limitation precludes counting a continuance originally assessed to a criminal defendant against the State (and, thus, against the speedy trial time) when a court later concludes the time was erroneously charged to the defendant in the first place. The limitation would be applicable here if we assume the continuances should not have been assessed to McMillan because he had not authorized or otherwise agreed to them. See *Dupree*, 304 Kan. at 49 ("We have recognized for speedy trial purposes that an attorney cannot continue a case over a defendant's objection."); *State v. Taylor*, No. 104,455, 2011 WL 3795481, at *3-4 (Kan. App. 2011) (unpublished opinion). The *Brownlee* court held that limitation precluded relief for Brownlee even though he had not agreed to (and had actually opposed) the continuances his lawyer sought and obtained. McMillan is in the same predicament:  Assuming the district court should have found the continuances were improperly granted because McMillan didn't agree to them, the second limitation in K.S.A. 2016 Supp. 22-3402(g) precluded any relief on his statutory speedy trial claim.

6

The second limitation should not be applied if prosecutorial misconduct were a factor in the challenged continuance or if a defendant's constitutional speedy trial rights would be compromised. K.S.A. 2016 Supp. 22-3402(g); see *Brownlee*, 302 Kan. at 510-11. We have mentioned McMillan raises no constitutional speedy trial issue. McMillan, however, suggests prosecutorial misconduct was afoot because the State's lawyers handling the continuances did not insist on his personal presence at the hearings. Brownlee cited similar circumstances in his case as possible misconduct, but the court applied the second limitation in K.S.A. 2012 Supp. 22-3402(g) anyway. *Brownlee*, 302 Kan. at 511. We necessarily follow that lead and discount the prosecutorial misconduct exception.

Consistent with *Dupree* and *Brownlee* and the dictates of K.S.A. 2016 Supp. 22-3402(g), McMillan has not shown a violation of his statutory right to a speedy trial that affords him relief from the jury's verdicts and the resulting judgment.

Closely allied with the speedy trial claim, McMillan argued in his written motion that he had been denied the opportunity to appear and speak at the hearings on the continuances—only his lawyer and the prosecutor were present. The argument turns on a different right—the right of criminal defendants to be personally present at every critical stage of the prosecutions against them. Kansas has a statutory right to that effect. K.S.A. 22-3405(1). The right to be present is also of constitutional magnitude as an integral part of the Sixth Amendment right to jury trial and the Fourteenth Amendment right to due process. See *State v. McDaniel*, 306 Kan. 595, Syl. ¶¶ 1-2, 395 P.3d 429 (2017).

The parties and the district court effectively ignored that aspect of McMillan's motion at the evidentiary hearing. And the district court never ruled on it. But McMillan has raised the point on appeal. So the posture of the issue as it comes to us matches what the court considered in *Wright*, 305 Kan. at 1179-80. The court in *Wright* recognized the absence of a defendant from a critical hearing or other proceeding—though a

constitutional breach—may be excused if the resulting error is harmless. 305 Kan. at 1179; see *State v. Verser*, 299 Kan. 776, Syl. ¶ 4, 326 P.3d 1046 (2014). That is, the error may be discounted if it did not deprive the defendant of a fair adjudication of the charges, meaning the jury would have returned a guilty verdict regardless of the error. As the party benefiting from the error, the State must show harmlessness beyond a reasonable doubt. *Wright*, 305 Kan. at 1179. In *Wright*, the court concluded the record was insufficient to evaluate harmlessness and remanded to the district court for further proceedings. 305 Kan. at 1180-81.

Given the record here, we do not need to remand. We make several assumptions that necessarily favor McMillan and examine the trial evidence to assess whether the jurors might have come to a different conclusion about his guilt. First, we assume each continuance of the scheduled trial date reflected a critical stage at which McMillan had a right to be present. As we have indicated, the defense lawyer in *Wright* asked for a single continuance that pushed the trial beyond what would have been the speedy trial time period, and the court recognized the hearing on that request to be a critical stage. Those circumstances and the court's ruling leave open the possibility that only the specific continuance that would exceed the speedy trial period amounts to a critical stage requiring the defendant's presence. But it could be that every request from the defense for a continuance represents a critical stage in a criminal prosecution. We give McMillan the benefit and presume the latter to be a correct statement of the law.

We next assume that had McMillan been present at each of the hearings, he personally would have asserted his statutory speedy trial right and would have objected to the continuance, notwithstanding his lawyer's request. The evidence presented at the hearing on McMillan's speedy trial motion is ambiguous on this point. McMillan testified he was not consulted about any of the continuances and never affirmatively approved them. And he testified he told his lawyer he opposed continuing the December 15 trial date. McMillan did not testify he voiced similar opposition to the other continuances, but

he was never asked a specific question aimed at eliciting that information. Accordingly, we assume McMillan would have objected to each continuance had he been present in the district court for those proceedings.

The question for us now is whether those requests would have affected the trial and outcome of the case. In other words, would the State have been so materially disadvantaged by having to bring McMillan to trial within 150 days that the jury might have found him not guilty? As provided in K.S.A. 2016 Supp. 22-3402(a), the State would have been entitled to continue the trial settings for that long even if McMillan objected. The State had used 47 of the allotted 150 days, meaning it had about 3 months' leeway in preparing its case. We look at the evidence and the legal issues the State had to manage in evaluating what impact a properly lodged speedy trial demand from McMillan would have had on the trial.

The evidence showed that McMillan and his then-wife were estranged and in the process of divorcing. Just before the shooting, they were arguing in the house and moved to the garage. In the midst of the argument, McMillan drew a pistol and shot his wife. He went back into the house where he shot their 13-year-old son and then shot their 5-year-old son. McMillan's father-in-law, who was staying at the home, saw much of the incident. McMillan fled from the residence and was quickly arrested. He declined to speak with law enforcement officers about what happened.

All three victims survived. The State charged McMillan with three counts of attempted first-degree murder, a severity level 1 felony. Those are serious charges, and the facts are fraught with the especially strong emotional currents of a parent trying to kill his children. The record, however, does not reveal a particularly difficult case for the State from an evidentiary standpoint. Identity was never seriously at issue. McMillan's ex-wife—they had divorced by the time of trial—his older son, and his former father-in-law all provided eyewitness accounts of the crimes. They identified McMillan as the

9

shooter. The State did not need DNA evidence or other forensic science to prove the case against McMillan.

McMillan did not testify in his own defense. Rather, two men testified briefly they had been with McMillan in the hours before the shootings and he had become quite intoxicated. So the case did not veer off into competing expert testimony about McMillan's mental health or some form of diminished capacity.

The district court instructed the jurors on attempted first-degree murder, lesser crimes of attempted intentional second-degree murder and attempted voluntary manslaughter based on heat of passion or sudden quarrel, and voluntary intoxication as a defense. See K.S.A. 2016 Supp. 21-5205(b) (jury may consider voluntary intoxication in deciding whether defendant had "particular intent or state of mind" required to commit charged crime); *State v. Kershaw*, 302 Kan. 772, 777-78, 359 P.3d 52 (2015) (voluntary intoxication as defense). The jurors deliberated about 2 hours before returning the guilty verdicts. They were then instructed on and considered special sentencing circumstances based on the ages and familial relationship of the children to McMillan. They found special circumstances existed.

All of that points to a comparatively straightforward case in which the evidence of McMillan's guilt was strong, if not compelling. We readily conclude the State could have been prepared to present its case within the speedy trial time if McMillan had insisted on enforcing that right. The State's case would have been no less compelling had it been required to go forward on that schedule. We find that to be so even if the governing time period were 90 days rather than 150 days—the State could have prepared for trial in the 6 weeks it would have had remaining. Thus, we may and do conclude beyond a reasonable doubt that any violations of McMillan's constitutional and statutory rights to be present to lodge objections to the continuances of the trial amount to harmless error.

10

We, therefore, affirm McMillan's convictions.

*Criminal History Issue*

At sentencing, the district court relied on the jury's finding of special circumstances on the two counts of attempted first-degree murder of the children and imposed consecutive sentences on McMillan on all three counts, yielding a controlling term of incarceration of 1,068 months. The district court determined McMillan had a criminal history placing him in category D based on a single person felony conviction from California in 1997 for willful infliction of corporal injury on a spouse, a violation of Cal. Penal Code § 273.5(a). McMillan had no other reported criminal history.

As we have indicated, McMillan contends the district court should have treated the California conviction as a nonperson felony, dropping his criminal history to category G. McMillan argues the district court made impermissible findings of fact in classifying the conviction, thereby violating his right to have a jury determine those facts. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *State v. Dickey*, 301 Kan. 1018, 1036, 350 P.3d 1054 (2015). Contrary to McMillan's position, the determination required no factfinding in this case, and the district court correctly found the California conviction to be a person felony for criminal history purposes.

Pertinent here, K.S.A. 2016 Supp. 21-6811(e) explains how out-of-state convictions are to be classified in establishing a defendant's criminal history. Whether the crime is treated as a felony or a misdemeanor depends upon the classification the other state ascribes. K.S.A. 2016 Supp. 21-6811(e)(2). Everybody agrees California treats the crime underlying McMillan's conviction there as a felony. To determine if the crime should be treated as a person offense or a nonperson offense, K.S.A. 2016 Supp. 21-6811(e)(3) directs the district court to look at the treatment of "comparable" Kansas

11

crimes in effect when the defendant committed the crime for which he or she is being sentenced. In making that determination, the district court should look at the elements of the out-of-state crime and the elements of any potentially comparable Kansas crime. *State v. Williams*, 299 Kan. 870, 873-74, 326 P.3d 1070 (2014). The elements need not be identical; the crimes will be treated as comparable if the analysis shows they "cover a similar type of criminal conduct." *State v. Fahnert*, 54 Kan. App. 2d 45, Syl. ¶ 2, 396 P.3d 723 (2017). The comparison entails a legal exercise based purely on the statutory descriptions of the crimes. The particular facts associated with the defendant's conviction are irrelevant. *Williams*, 299 Kan. at 874-75.

In 1997, the California crime punished a spouse, a person cohabiting with another person, or a parent of a child for inflicting "a corporal injury resulting in a traumatic condition" on the other spouse, domestic partner, or parent. The statute defined "traumatic condition" as entailing "external or internal injury, whether of a minor or serious nature, caused by a physical force." Cal. Penal Code § 273.5(a), (c). As the State points out, the California offense is comparable to domestic battery, criminalized in K.S.A. 2016 Supp. 21-5414. Domestic battery criminalizes, among other conduct, one family or household member "knowingly or recklessly causing bodily harm" to another family or household member. K.S.A. 2016 Supp. 21-5414(a)(1). The term "family or household member" covers spouses, domestic partners, and parents of a child in addition to other persons who reside together or have resided together. K.S.A. 2016 Supp. 21-5414(c).

The California statute applied to a narrower class of people as potential defendants and victims and encompassed a broader range of physical harm than does the Kansas domestic battery statute. The overall purpose of both statutes, however, is the same, and they criminalize common kinds of conduct. The statutes target violence between persons in marital and domestic relationships and seek to curtail repetitive instances of abuse between the same individuals. The California statute required convicted defendants to go

12

through counseling and imposed escalating penalties for successive convictions. Cal. Penal Code § 273.5. Defendants convicted of domestic battery in Kansas are treated similarly. K.S.A. 2016 Supp. 21-5414(b).

McMillan's 1997 California conviction, therefore, is comparable to a Kansas conviction for domestic battery. Kansas classifies domestic battery as a person offense, so the California conviction should be classified that way for criminal history purposes. Although Kansas domestic battery is a misdemeanor rather than a felony, that has no bearing on the person-nonperson classification.

The district court correctly treated McMillan's California conviction as a person felony for criminal history purposes. We affirm the sentences the district court imposed.

Having examined the points McMillan has raised in light of the appellate record, we find no basis for granting him relief from the convictions or the resulting sentences.

Affirmed.